Good afternoon, if it may please the court Jeff Harrison for appellant Larry Beauchamp. Good afternoon. I would like to reserve five minutes for rebuttal. Your Honor, Plaintiff Larry Beauchamp proved at the time of trial that the City of Long Beach failed to provide programmatic access to its sidewalks within a subject area, even when seen in its entirety, so as to require the imposition of injunctive relief to make the subject area readily accessible. It is important to note that at no time during the litigation did Mr. Beauchamp seek injunctive relief to remove barriers outside of the subject area. Sixteen years after the City was required to have their barriers removed under the programmatic access obligations of public entities pursuant to 28 CFR 35.150, Mr. Beauchamp proved at trial that 87 percent of all the corners surveyed were inaccessible for one reason or another. Specifically out of 393 corners of intersections, 60 of those corners didn't have curb ramps and 284 of those curb ramps had inaccessible curb ramps. Let me ask you, I'm sorry, let me ask you, it appears to me that the plaintiff bears the burden of establishing inaccessibility and how did the plaintiff meet this burden of showing the City's sidewalks were constructed or altered after January 26, 1992? Well, Your Honor, if I can take that in two different parts. First of all, we don't think we necessarily had to prove that it was those curb ramps were constructed or altered after 1992 because we can show, based on the survey that we did, that programmatically they do not comply with their obligations to provide a readily accessible sidewalks in their city, in this area. Okay. Stop there for a second. Those would be without regard to whether or not they're constructed after 1992. Let's assume you did show that. How do we review the judge's decision whether or not to grant injunctive relief? Does the judge still have discretion, even if you've proved the violation, to determine that injunctive relief isn't the appropriate remedy? I don't believe under the ADA that he does, Your Honor. Once we show that the City failed to provide programmatic access in all of its sidewalks, I believe the court has to issue injunctive relief to make them do that. They've had 16 years to comply with the law. Well, now, Mike, so your position is that once a violation is shown, a programmatic violation is shown, the normal rules about whether to grant an injunction don't apply, an injunction must be? I believe the injunction is mandatory in this situation, Your Honor. Additionally, we also proved there were a large number of curb ramps that were, in fact, constructed or altered after 1992. Could you just explain, in response to Judge Hurwitz's question, what is the basis for saying it's mandatory? I know the injunctive relief under ADA comes through this interlocking nesting series. And ultimately, it ends with a statute that says you have to intentionally show something for the employment violation. But what's the basis or what proves that an injunction is mandatory? I believe when you track the remedies back, you have to go back through Section 504 of the Rehab Act, and then you have to go back through the Civil Rights Act. You get to the language, and I don't have the language in front of me, that says when the violation occurs, you shall have the injunctive relief to remedy that discrimination. Do you have a specific case espousing your interpretation? Or if we were to accept your interpretation, would this be the first case? I don't have a case present at the moment. Okay. So I'm looking at 42 U.S.C. 2005e sub g sub 1, which, according to my notes at least, is the actual statute. And that says if the Court finds that the Respondent has intentionally engaged in an unlawful employment practice, the Court may enjoin the Respondent from engaging in such unlawful employment practice. So are you relying on 2005e G1 or something else? Because that's clearly permissive. Yes, Your Honor. And again, unfortunately, I don't have the site because neither site actually briefed that issue. So I don't actually have the site for where the mandatory injunctive relief comes from. So I don't have that. I'm not aware of another case that has, in fact, addressed the issue one way or the other. Let's assume for purposes of discussion that we would have to find an abusive discretion by the trial judge in order to reverse his decision not to provide injunctive relief. Tell me why you think there was an abusive discretion there. Your Honor, when you survey an entire area, no matter how large or small it is, and you find that 87% of the curb ramps and an additional 79% of the sidewalks are completely inaccessible, those numbers have to dictate that there is a failure to provide programmatic access. There's no other way to look at those numbers. Could I just, getting back to this programmatic aspect that we've been assuming, the district court said, well, you were only looking at 2.5 square miles, but based on the language of the statute, we have to find that viewed in its entirety, the program, which it said was all city sidewalks, was not accessible. And the district court said, well, the plaintiff has not carried its burden of demonstrating that all 50 square miles of sidewalks and intersections were inaccessible. So what was wrong with that decision? Your Honor, and I would agree with that if, in fact, what Mr. Beauchamp was looking for in that litigation was injunctive relief to remove barriers throughout the entire city of Long Beach. But first, there has to be a violation. I mean, the district court was saying there's no violation because we have to look at all of the city streets in their entirety, not just at the particular area that Mr. Beauchamp identifies. And I believe that's correct, Your Honor. As to what the trial judge believed, I believe that's incorrect because I don't believe there's anywhere in the statute that says you have to look at the entire city to determine programmatic access when viewed in its entirety. There is no language in the code section. There is no case law, I believe, that provides that when viewed in its entirety means the entire city, when you're only seeking injunctive relief for a portion. As an example of the case law. Well, but could you do it for a block? That was the good point. Yeah. I mean, the way that you're defining it, it just seems like I could do it, you know, just for my block. Potentially, it would depend on what else is on that block. But I would offer that you could have a very small subset of the city, and if that subset was completely inaccessible, just as this is, even if the rest of the city was completely accessible, there would still be a failure of programmatic access because all the people in that section of the city are still suffering the discrimination. So I don't believe that you have to find that there's programmatic access when viewed in its entirety. By looking at all of the programs and all the sidewalks in the entire city, that is more information, quite frankly. But then programmatic access is whatever a plaintiff defines it as. They define the program. Something about that doesn't quite make sense. And I understand that, Your Honor. And there has to be some weighing of it. But I also believe that when the ADA, Congress enacted the ADA, talked about needing effective enforcement provisions, which is the only way to make the ADA meaningful, taking an individual who is disabled, with limited resources, and requiring them to survey a city the size of Long Beach, every single curb ramp, every single sidewalk, simply to try and get a particular area. Well, that's sort of a policy issue, and we're just dealing with the language of the statute. I mean, in Lauenberger, we said, well, there's no private right of action to enforce a transition plan. But this would seem like an end-run around that, because, in fact, it would sort of make the transition plan regulation superfluous, because anyone can come in and get an injunction for the particular curb or sidewalk that they wanted to be fixed. That doesn't seem to be what the regulations require or that Lauenberger allows. And I don't believe the regulations require that the entire city has to be viewed. What the requirements were under 35.150 is that a city had to look at its curb ramps and its sidewalks. It had to prioritize them. So I think there's an argument that if there was one block and it was in a residential area and it didn't really connect to retail areas, I think there's an argument that it may not be relevant. It may not be a specific area that could be defined through programmatic access. But when you have here an area that is bordered by very major streets, east-west thoroughfares, north-south thoroughfares connecting lots of different retail and commercial areas and residential, I think it can be looked at as a subset of the entire city. And I don't think that the code or any case requires that the entire city would have to be looked at to determine if this area is in violation of programmatic access. It would be inherently unfair if you had an area that has been completely disregarded by the city. Everywhere else they decide to put in curb ramps and sidewalks that are compliant, but in this area they leave it alone. That would be inherently unfair to those citizens then if the city were able to say, but when viewed entirely everywhere else in the city it's beautiful and gorgeous and compliant. You guys just have to suffer, I guess. As I understand it, the showing or at least the expert testimony was that in this particular area, 2.5 square miles, I think, 87 percent of the curbs were noncompliant? Yes, Your Honor. Let's assume it was 50 percent. Would that require an injunction? I would actually argue it depends on where they are, Your Honor. And I guess that leads to my real question, which is that if the district judge, contrary to your assertion, has some discretion in this circumstance, how can we determine that he abused it? Because at 87 percent, there's no rule. Is it just by percentage then? In this case, yes, Your Honor. You can also look, and we did the analysis, by every street, every curb ramp, so you can see if you actually have paths of travel. If it were 50 percent and it was every other curb ramp was noncompliant, you wouldn't have a single accessible path of travel. That would be a failure of programmatic access, I believe. So you'd almost have to look at, are there accessible routes? The city put on no evidence at trial of any alternative accessible routes, none. They also didn't put on any evidence of undue burden, no defenses in this case. If I may, Your Honor, I know you need to talk to you. I need to talk to you. It's our time. So I need to talk to you about damages. Okay. So I won't, please. Thank you. Well, good. We're in sync then. The district court seemed to find that there were 440-plus occasions where the plaintiff encountered noncompliant sidewalks and curb ramps, correct? Yes, Your Honor. And so that appeared to be a finding. And the statutory damage seems to be, what, a minimum award of $1,000. But there also seems to be an indication that a district court can aggregate. I know you're claiming $441,000. So I'd like you to talk about that. But then we've got $17,000. What is your explanation of the $17,000? I really, Your Honor, in fairness, I really don't have a good explanation. I know what the judge said. He did aggregate certain barriers and gave arbitrary amounts, in our opinion, for certain barriers. I can't really tell you how he did that. They do seem completely arbitrary. Well, are you – is it your view that you can't aggregate? Absolutely, Your Honor. Well, if we don't agree with that, then what would be your interpretation of how aggregation could occur? Because there does seem to be some indication. There does seem to be some support for the fact that it can be aggregated. I really don't know how aggregation would work, especially in the light of the actual language of Civil Code 54.3 that says it's on each offense. And the case is that – Let me ask you a question about that. And I realize we're using up your time, but this is – it's important to me. The new provision in 55.56 – is it 5H? The one that says if you've got multiple confrontations of a single barrier, then the court should take into account whether the plaintiff has mitigated his damages. That was added in 2012, and that doesn't apply here. It applies to deterrence rather than actual confrontation. But does that – does that have any relevance to this case? Does it suggest that the law was somehow different before the statute was changed? I don't believe it does have any relevance, Your Honor, because there's language within that code section that still talks about damages per occurrence. And so I would argue – No, and I think everybody agrees that the court has the power to give – maybe not everybody agrees, but certainly the district court thought it had the power to give per occurrence damages. The question was whether it could somehow limit them in some way. There was a line previously in the code prior to 55.56 that talked about a duty to mitigate damages. I'm not sure that was ever really clarified. I've never seen a case that actually discussed what that duty is. We have some difficulty with that language because, as an example, in the state of Long Beach, if we were to mitigate our damages by not going on those curb ramps that we know are not compliant, well, 87 percent of them are not compliant. So I guess that would be why. Well, but the damages are Mr. Beauchamp's, not – and so the question is – and I don't know the fact – I don't know that the record discloses this, but, for example, if he could have gone two blocks out of the way and used a compliant curb but chose every day to go off the – to go to the noncompliant one, I could see a district judge saying, you know, I'm not going to give you damages for each of those occasions. That was my point, though, Your Honor. When it was 87 percent of your curb ramps are noncompliant and 79 percent of your sidewalk sections, you don't have any other place to go. Well, my question is a precise one, which is that was there anything in this record about attempts to mitigate? No, Your Honor. It was not addressed. Well, I mean, there could be situations, say, where you decide to go on a walk. And so whether you decide to go on a walk where there's noncompliant curbs or you could go on other ones, the court might say, well, you didn't – but let's say, on the other hand, you had to go to the store. Maybe there's only one real way to go to the store. That might be a situation where you wouldn't aggregate. Correct. But in this specific case, Your Honor, maybe this does address the previous questions. One of the main areas of noncompliance was the bus stop that was closest to Mr. Beauchamp's home. That's where he actually experienced the vast majority of these. So the judge, I believe, looked at that and said, okay, well, it's the bus stop closest to his home. He would have to go out of his way to go find a different bus stop. So to some extent, I guess, without actually talking about it, he may have  But the judge said, no, that's where he needs to go to, that's how he travels. He travels either by rolling in the street or taking buses. That's how he goes. So he's not – But what do you want us to do about damages? What – What – what appellant wants is the letter of the law for 54.3 saying that for every occurrence there is a violation, and there are very specific findings by the trial court that Mr. Beauchamp was denied fair and equal access, he should be awarded $1,000 minimum for each of those occurrences that were specifically found by this trial judge. Is there any evidence that he suffered more than $1,000 of damages for any occurrence? No, Your Honor. So what you're asking us to do is to remand with instructions to award $441,000, $440,000? Yes, Your Honor. The trial court made some determinations that there were a bunch of other things, but it doesn't define what those numbers are, so we would stay with just the numbers he actually specifically defined. And so you're saying that we're – any way that we look at it, that we're – because it was a finding at a bench trial that we're stuck with the 441 or 440 or whatever it is. The trial court made very specific findings of a denial of fair and equal access by the city against Mr. Beauchamp 440 times within the statutory period. Very specific findings on that. Then I think it's incumbent upon the trial judge and then ultimately this Court to – Okay. You're ultimately over your time, but I want to give my colleagues an opportunity to ask questions. No. Just use whatever. The district court didn't address any injunctions under California law. And it wasn't clear to me from looking at the record that you had argued that Was that something that was argued before the district court, that in addition to an injunction under the ADA, you were entitled to an injunction as a matter of California law? It was argued, but that is permissive. So I'm not going to be here today arguing that he had to issue injunctive relief to remove barriers under the California statutory framework. Okay. Thank you. All right. We've used all your time and over, but I'll give you two minutes for rebuttal, and if we need more, we'll take whatever we need in order to answer our questions at this point. Thank you. Good afternoon. Good morning, Your Honor. This is Alicia from the city of Long Beach. Could you get a little closer to the mic? I'm having difficulty hearing you. Louder. How's this? That's better. Better? Okay. On the ADA issue, it seems that the court is suggesting that plaintiff's neighborhood could be considered a program, service, or activity in and of itself, and I think that's wrong. Well, he has no case law for that, but do you have any case law for the contrary as to what a program is? Well, the Ninth Circuit in Barton decided that the sidewalks, city sidewalks, are a program, service, or activity. So if something is a program, service, or activity, it has to be viewed in its entirety to determine whether or not it's accessible, because otherwise you could always take some small subset of some systems, such as the city sidewalks, and say that it's inaccessible. For instance, in this courthouse, we could say the front stairs are inaccessible when there's actually a wheelchair ramp a few feet away. So let's assume a city had five parks and one of them was completely inaccessible. Could a district court grant an injunctive relief under those circumstances telling it to make that the one park want to be made accessible? I think that's a harder case because a park itself perhaps could be considered a program or service because of the nature of the park itself, just like a courthouse could be considered a program or service. What do you do with the argument that Mr. Harrison made that for Mr. Beachamp, the sidewalks were because he lives in this area and he can't get to a bus? And so for him, this really is an inaccessible public accommodation. The fact that the sidewalks are accessible six miles away is of no real aid to him. Well, when you look at a system as a whole, there may be some parts that might be inaccessible, even if the program or service as a whole is accessible. And under plaintiff's interpretation, you could always carve up some arbitrary subset of a program. Well, I agree that his doesn't make sense, but I think what Judge Hurwitz is saying, it doesn't make sense that Mr. Beauchamp can't get anywhere where he lives. You know, if his whole area were inaccessible, what would be his remedy? He has no remedy? Well, the purpose of Title II of the ADA was to make programs or services accessible over time, and it's impossible to make every square inch of a city accessible. No, and I understand that, but we have a different set of proof here, I think. As I understand it, the set of proof is that in this area in which he lives, and particularly given where he lives, he can't get to the bus. Eighty-seven percent of the curb ramps are not accessible. A lot of people live there. It's 2.5 miles, and it's been that way for 16 years. And you're saying, yeah, but other parts of the city are much better. Doesn't the Act sort of suggest that under that circumstance a court ought to step in and act? Well, I think the problem is that if you allow a plaintiff to arbitrarily take some small area and say that it's inaccessible, that area could get smaller and smaller. You could just take one block and say that. It could, but here we have a 2.5-square-mile area. It's not tiny. So 2.5 miles on each side, I guess. So the question is, why isn't this big enough? Because the city's sidewalks are a system. You have to look at the system of sidewalks as a whole. So he just has to move. Is that what your solution is for him? Move somewhere that's got better sidewalks? Well, he has to wait. He has to wait. Basically, Title II says that if there are new facilities constructed, they have to be made immediately accessible. But if facilities are already existing, then you look at the system as a whole, the system of sidewalks as a whole within the city, which is 50 square miles, and you ask, is that accessible or not? And if there are parts of the city that are inaccessible, they will be upgraded over time. But you have to look at the city as a whole. Does the city's transition plan deal with this 2.5-square-mile area? And if so, when is it going to be transitioned to be accessible? There wasn't anything in the record about whether the transition plan addressed this particular area. The city's transition plan did address key areas like the government buildings, government facilities, and addressed sidewalks and curb ramps in connection with those areas. And that's required by the regulations, right, to prioritize those areas first? Right, because you're looking at the city's system of sidewalks as a whole. The city includes a lot of areas. So has nothing been done in his area for 16 years? It's unclear. And what does the record disclose about the city's system of sidewalks as a whole? Well, the city had a transition plan where they evaluated key all the government buildings and facilities and curb ramps and sidewalks in connection with those areas. The city also has a complaint process where if people have inaccessible areas, they can call the city and the city will come out and install curb ramps. The city also allocated over $3 million for sidewalk renovations and repair throughout the city. But I think the larger point is that the city cannot afford to immediately go out and make every single area 100% accessible. Well, I think, but is there they can't afford it. But it's a little bit like special education and all of those things. A lot of the schools can't afford to give what people that are tested are entitled to, but that doesn't excuse the schools from supplying students that have IEPs and those sort of things. So, I mean, what does the law allow in terms, you can't afford it, and it's not that, and no one has any money. I live in a city that's declaring bankruptcy, so I certainly, but the problem is what are you allowed? The fact that you can't afford it doesn't mean you can do nothing, right? Well, the intent of Title II of the ADA was to make cities accessible, fully accessible over time, and that will actually take time. So how much time have we had here? Well, the ADA was passed in 1992. So how much more accessible is the city today? Well, that's not in the record, but I would guess that it's much more accessible than it was in 1992. In his area? What about in his area? His area, we're not sure. But the point is that plaintiff has to prove that the city's system of sidewalks as a whole is inaccessible, or he has to go to specific curbs in his neighborhood and prove that they're inaccessible in that they don't meet current ADA design standards. Well, now, didn't he prove that in his area? The district court found that he encountered 441 areas that were inaccessible, right? His expert, well, on 440 occasions he encountered inaccessible areas. Okay. So aren't we stuck with that finding of the district court? I mean, it was a bench trial, right? Well, we are stuck with the district court's findings, but the district court found that plaintiffs showed that certain areas were inaccessible, but he didn't show that they were built after 1992, which is the ADA effective date. So how the heck do we explain the $17,000? I've been scratching my head, and I have, I mean, how do we come up with $17,000 out of, if we start at 441, a minimum of $1,000 each, so that's $441,000. $17,000, was it just like, okay, I kind of think, well, I'm going to give you X percentage? I can't tell from, how can we tell from the record how the $17,000, the court came up with that? So we're talking about California damages. Well, there were 400, plaintiff claimed 440 denials. And the court found them? Yes. The court did, the court did find that he was denied access. But the legislative history and the statute and everything that we've cited in our brief makes clear that the fact finder has discretion to aggregate those. Does the statute say that anywhere? The statute itself. Justice Scalia has warned us from time to time that legislative history ought not be relied on. He's not my favorite authority, but he's sometimes right. Where does the actual language of the statute say that? Civil Code 54.3 says that the damages may be awarded for each offense. And a minimum of $1,000, right? Right. Well, the offense, if the offense is only the failure to fix the curb, then it should be $4,000, right? Because there's only four places. Right. So $17,000 makes no sense under any theory, does it? Well, that's actually not true. The court found that we've cited other parts of the California Disabled Persons Act, other sections of the act, legislative history, and California case law interpreting the California Constitution that make it clear that the fact finder has to have discretion to aggregate multiple occasions where the plaintiff was denied. But how did the court aggregate here? What did the court aggregate? Which obstructions, which violations, how much for each? How do we get to $17,000? Well, did the court find it? From a finding of 441, how do we get to 17,000? Well, there were four specific areas. There was one area near the Pizza Hut where the plaintiff was denied access something like maybe once a month for two years. And so the court called that $5,000. Okay. But how did he get to 5? How did he do it? Well, I understand. We know what the separate breakdown per location are. But I'm just saying how did he do that? But how do we review it? How do we review it for reasonableness? Well, I think part of it, well, we look at, well, it's the plaintiff's burden to show that this finding was clearly erroneous. Well, but isn't it the district court, doesn't the district court have to give us something to review? In other words, how can we, the plaintiff says I'm entitled as a matter of law to 441. You say no, the district court can reduce it to some other number based on something. And my question is how can we tell what the district court did? Well, the court could have found that plaintiff wasn't necessarily reasonable or didn't actually have to show. But did it find that? Not explicitly, but the judgment is presumed correct. So unless the plaintiff shows that it was clearly erroneous, we have the district court. So the district judge can choose any number then? Well, to some extent he's exercising his discretion. It's kind of like attorney's fees. If I don't even know what the hourly rate is and I don't know how many hours people worked or I don't say I find ten hours to be reasonable for this particular motion and this, that and the other, then it doesn't have to be exact, but there's something. I can't come, I don't know what, I can't figure out anything for $17,000. Again, we know what the individual numbers are, but I can't tell, I can't tell why on the one, I think it's the bus stop that has the most encounters. I may be wrong about that. But there's one in which there's hundreds of encounters and that gets $5,000. And another one for which there's many fewer gets $4,000. Well, for the bus stop it's possible that the court thought that the plaintiff could have used another bus stop.  But why is the bus stop almost impossible? It's almost equivalent to the Pizza Hut in terms of the, I mean, I can't even compare the numbers because I can't figure out why one is five and one is four and whatever the other two are. Can you? If you have an explanation, we'd love to hear it. But it's almost like there's a dart board and you go, oh, $5,000. $4,000. Well, admittedly, the court was not very clear about how it's exercised discretion. So how do we review whether the court abused its discretion if we don't even know how the court exercised its discretion? Well, if the court really believes that the court, well, the court could remand to the district court to explain how it abused its discretion. Well, we know we could. We're just asking you what, you know, what are, what, you don't want us to do that. So it would be your responsibility to tell us how we, what, what can we review to see how the $17,000. The Trier effect has discretion to aggregate multiple denials of access. And the court did that. And presumably it did that because it thought that the plaintiff's conduct was not necessarily reasonable in the sense the plaintiff didn't have to go. Did the court say that? The court didn't say that, but we can presume. We could guess. We could guess. Well. Let me ask you a question about the aggregation of multiple circumstances of denial of access. The California Supreme Court's never spoken on this, has it? No, but it has construed other statutes. Right. But not this statute. Not this statute. No, not this statute. So should we certify this issue to the California Supreme Court? Well, the court could certainly, it would certainly be. I know we can. I'm asking you should we. No, you shouldn't, because it's, I think it's pretty clear from what this California Supreme Court has done with other per-violation or per-offense statutes that have penalties, it's pretty clear that the California Supreme Court would find that it's unconstitutional to mandate that. Well, then you'll win if it goes there. So why don't you want it to go there? Well, it would cost a lot of money to brief and take a lot more time. Well, time doesn't seem to concern anyone up to this point, so. There's no appellate, California appellate courts construing this part of the statute? Not this particular part. They've construed similar statutes, but not this particular part. So, I mean, it's an open question, at least in the California courts. You make an argument that the California courts would surely resolve it your way because of legislative history and constitutional provisions. But at least as to this provision, there isn't any appellate decision at all telling us. I believe that there are California appellate court decisions saying that this, per each offense, cannot be construed to allow daily damages. Right. But for this exact issue? Yeah, but those are somebody who stays at a hotel, for example, for a long period of time. Right. But here we've got 440, not daily, but 440 separate instances. Is there any California court decision that says those can be broken down and aggregated, if you will? Not that I'm aware of. So what would be your closest precedent that says aggregation is okay? You don't have it on this statute, but what would be your closest precedent? Well, there are the California appellate court decisions saying that you can't get daily damages under this statute. But I think the most useful case is the California Supreme Court case that we cited that said that, you know, for a per-violation statute that imposes a minimum penalty, the fact finder has to have discretion to be able to aggregate those instances because otherwise it would be an unlimited penalty, it would be unconstitutional, and it would allow basically, you know, in a case like this. Do you have any case that would, if let's say the district court had given 1,000 per violation, is there any case that said the district court can't do that? Well, I think we would, it would depend. If the district court found that it had to give 1,000 per violation. No, just say that it could. If the district court had given $441,000 in damages, what would you be arguing here in terms of saying why the district court couldn't do that? What would be? Well, we would argue that the district court apparently believed that it had to give $1,000 for every. But 1,000 is the minimum. It can go higher than 1,000, right? It could. So the district court made a specific factual finding of 441 times, and the statute says it's a minimum of 1,000, and it can go higher. And there's nothing, there's no California Supreme Court case or any California case that says that you have to aggregate. And there doesn't appear to be any case that says that you can't give individual violations, right? Well, the California Supreme Court case that we cited was reviewing a trial court decision that had given, I believe it was, but it was daily. That's different than over a period of years and different encounters, right? So that's not exactly on point. Well, it's on point in the sense that the district court, if the district court had done that, it would apparently have believed that it had to award $1,000 for every offense and that it didn't have any discretion. And we also ---- No, it could have said, I think all of these, no, I want to award $1,000 on each one of them. It could have said that. I don't have to, but I could. Well, in this particular case, we would say that the plaintiff had, he had alternative routes that he could have taken, that his conduct wasn't reasonable, and most important, we would argue that in between these violations, the city didn't do anything other than fail to fix those curbs. And so the city's ---- Was there any evidence in this record that the plaintiff could have taken alternative routes? For the bus stop, there was evidence that he could have used an alternate bus stop that was a little bit farther away. Like how much further? I believe it was a block. It was about a block away. For the pizza hut, well, he obviously didn't have to go to the pizza hut. And then for the other areas, which were Atlantic Street and South Street, which is basically forming, you know, one contiguous area like an L, the district court could have found that the plaintiff didn't have to use those streets as many times as he said he did. Okay. Anyone? We have no additional questions. Thank you. Thank you, Your Honor. All right. So I'll give you two minutes. Thank you, Your Honor. I want to address some of the issues that were raised. First of all, I think it's important to understand that Mr. Bush, at trial, did prove that there were post-ADA curb ramps constructed or altered in the subject area. Out of the 79 that were constructed, 69 were noncompliant. Again, proving that the programmatic access, when seen in its entirety, they're still doing it wrong. So even when they're coming in, it's only 79, but 69 of those were still noncompliant. The city has had 16 years since it was required to complete its barrier removal under 35.150. 16 years since 1995, which is what the code says, the regulations say, you have to complete your barrier removal for programmatic access. We have an entire area of 2.5 square miles completely inaccessible. The numbers are overwhelming. It can't be that Mr. Beauchamp has to prove that the entire city is inaccessible when his entire area, large, major streets and side streets, connecting retail, commercial areas, completely and fully inaccessible. Well, is it proof that they're completely, wholly inaccessible? I thought the proof was that 87% of the curbs were not compliant. Eighty-seven percent of your curb ramps, Your Honor, means you don't have paths of travel. That means you're having to get off the street and roll, I mean, get off the sidewalk and roll in the street and putting your life at risk because you're now with vehicular traffic. This isn't 10%, 20%. This is 87%. There's only 13% that's compliant in this entire 2.5 square miles area. That's a very small percentage. Of the noncompliant, and this is what I'm trying to find out right now, of the noncompliant 87%, does that mean that they weren't ramped or that they were ramped in a way that didn't meet the code? Eighty-seven percent is a combination of both. Right. And as to some, my question is, is there anything in this record about what percentage of the ramps, what percentage of the curbs in that area were non-ramped? Yes, Your Honor. It was the number I said earlier. Wasn't it closer to? It was, I believe, 60 out of the 383. Right. Had no ramps. Had no ramps. So it was one-sixth or so. Roughly. Okay. And was there anything in the record about whether the ones that were ramped with noncompliant ramps were, in effect, inaccessible to Mr. Beauchamp? It talked about the seriousness of them being such that Mr. Beauchamp would only feel safe if he bypassed those and rolled into the street instead. Some of them had a slope that was larger than the? It's either an excessive slope, excessive side flares, not enough room on the top landing. There were multiple violations on most of these curb ramps. It wasn't one or two issues. It was multiple. So that's what made this area so inaccessible. The city did talk about how they don't have the money to do all this work. I want to be really clear, they did not raise an undue burden of defense in the trial or at any time during the litigation. So they can claim that now, obviously, in the appeal, but they don't really have that ability. That was not raised at any point. It talked about the time period for compliance. Mr. Beauchamp has waited. Waited 16 years for compliance pursuant to the rest. Still waiting. This area completely noncompliant. No case law has determined that aggregating the damages is, in fact, allowed. And there's no case that said it's mandatory to give $1,000 on every single one either, right? Correct. So should we certify this? Absolutely. You like the California Supreme Court better than your opponent does, I guess. Absolutely. I believe the code section is crystal clear. It is for every offense. And I believe the Supreme Court of the United States case that we cited, L.A. Westerman v. Digital Printing. Well, it shouldn't make any difference because her argument is that the California Constitution prevents this. So I don't think the U.S. Supreme Court is definitive on what the California Constitution requires. All right.  Thank you. And your two minutes over the other two minutes that I gave you. But if my colleagues have any additional questions, I want them to feel free to ask. I think we're done. Thank you very much. So thank you both for your argument. This matter will stand submitted. This Court is in recess.
judges: Callahan, Ikuta, Hurwitz